[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for dissolution of marriage. The parties are each seeking other relief, including competing claims for custody of their child. The matter was referred to the Regional Family Trial Docket and tried over several days. At the conclusion of the parties' presentation of evidence, the court determined that it wanted a psychological CT Page 14727 evaluation of the parents and kept the evidence open for that purpose. The parties submitted to the court ordered evaluation and the matter was then concluded after testimony from the evaluator. The court has carefully considered the statutory criteria for the granting of a dissolution of marriage and orders of custody, visitation, child support, alimony, orders of life insurance, health insurance and payment of the children's health expenditures, and the award of counsel fees.
The court finds that it has jurisdiction over the marriage. One party has resided in Connecticut continually for more than one year prior to the bringing of this action. The parties were married on August 7, 1993 in Milford, Connecticut. They have one minor child born issue of the marriage, namely John Fulton born on April 3, 1996. No other minor children have been born to the wife since the date of the marriage. The parties have not been recipients of state assistance. The marriage between the parties has broken down irretrievably with no reasonable hope of reconciliation.
The plaintiff, Isabelle Fulton is 40 years of age. She has a high school diploma and a nursing degree. She is a licensed registered nurse in the State of Connecticut. She had accomplished this education and licensing prior to meeting the defendant. This is her first marriage. The plaintiff's general physical health is fine. She has had substantial problems with her mental or psychiatric health, which will be described more fully hereinafter. While these problems disabled her from employment for a substantial period of time, she is back to work on a full time basis. As of the close of the hearing in August, she was completing her employment at Harborside Willows as a nurse and about to start at Bridgeport Hospital. While counsel were told that no evidence but the testimony of the psychologist would be permitted at the continued hearing date in October, in the interest of full disclosure, the plaintiff's counsel submitted an updated financial affidavit reflecting that the plaintiff was no longer at Bridgeport Hospital, but instead was working at Milford Health Care Center. Counsel represented that the income amounts remained unchanged and the court will use the income amounts from the evidence in August since they remain unchanged and so that the defendant, who through counsel objected to the provision of this additional information as a breach of the court ruling, suffers no harm or prejudice.
Prior to the birth of the child, the plaintiff had worked as a registered nurse at St. Raphael's Hospital for about 16 years. Her pay rate reached between $22.00 and $23.00 per hour at the time that she left St. Raphael's. At the Harborside Willows she had been earning $24.15 per hour. At Bridgeport Hospital she expected to earn $864.00 per week gross for a 36 hour work week, which factors out to $24.00 per hour. She CT Page 14728 brought $2,000 in savings to the marriage.
The defendant Thomas Fulton is 41 years old. This is his second marriage. He has a high school diploma and received an appointment to the United States Naval Academy where he earned a bachelor's degree in Oceanography. He then was an officer in the Navy for a period of six years. He left the Navy with an honorable discharge in 1986 . . . Thereafter, he became a franchise owner of several Jiffy Lube shops which as a result of litigation regarding the franchises, he was forced to sell his ownership interest in 1991. He received $96,000.00 in net funds from the sale. He invested them. From this source and its appreciation, the defendant amassed savings before the parties decided to get married. The plaintiff acknowledges that her husband brought about $100,000.00 in savings to the marriage.
The parties met in 1989. As a part of the parties' marital plans, they were going to move to New Jersey in the area the defendant had grown up because he felt a duty to look after his parents as they were aging. They married on August 7, 1993. At that time, the defendant paid off the plaintiff's car loan for her. In anticipation of the move planned for May, 1994, both parties made job inquiry in Camden, New Jersey. The plaintiff was offered a job and instead of accepting it she decided she could not move from the Milford area in which she had grown up and her father was very ill. The plaintiff told the defendant to go ahead and go alone and divorce her if he desired. He did not. Meanwhile, the defendant who had continued to work at Jiffy Lube, had terminated his employment there in anticipation of the move. In May, 1994, he went back to work at Jiffy Lube making significantly ($26,900 rather than 37,500) less than before as a result of all of the loss of the seniority and preferences he had enjoyed.
The parties purchased their present home at 29 Crowley Avenue in Milford. The purchase price was $156,000.00. The down payment of $36,000.00 for the home came from the funds that Mr. Fulton received from the sale of his Jiffy Lube franchises. A new roof front steps and deck were also put on the house from those funds. Up until the birth of John the parties never amassed any significant joint savings from their respective incomes; they would utilize the funds for the purchase of major household items.
The defendant currently has a balance of $73,683 in funds remaining from his Jiffy Lube franchise sale. Those funds were received by him premaritally for franchises he had built up. At some point, he put these funds in joint names with his wife in the Merrill Lynch cash management account. CT Page 14729
John Fulton was born April 3, 1996. Ms. Fulton displayed many symptoms of illness after the birth of John. Initially she experienced a racing heart feeling, sweats, and a feeling like she was going to pass out. She sought medical advice to cope with her symptoms. She tried to go back to work from July, 1996 into the fall with her mother as the day care provider. She was very depressed and slept a lot. She suffered with bouts of anxiety and panic attacks as well. She became agoraphobic, leaving the home only for necessary medical appointments. Her mother came to live with the family to help with the care of John while the defendant was at work. The family relations officer testified, and the court accepted as fact, that during this time the plaintiff slept much of the time and her mother was instrumental in providing the care of John.
Ultimately, about one year into existing with the symptoms and being out of work on disability, the plaintiff, after treating with several other physicians, was diagnosed by Dr. Berv, a psychiatrist, who worked to stabilize her on several different medicines. He diagnosed her as suffering from major depression and panic disorder. He later amended the latter diagnosis of panic disorder, to panic disorder with agoraphobia. By the end of October, 1997 she was somewhat less depressed but still her anxiety symptoms continued. He initially prescribed her Paxil and by April to May, 1998, she started to show significant improvement. He ultimately prescribed her a regimen of Klonopin, an anti-anxiety medication, Celexa, an anti-depressant, Propranolol, to block things like tremors which are peripheral manifestations of anxiety and Doxepin at bedtime, for sleep.
She began clinical work with Julian Hart, a psychologist, who administered her cognitive behavioral treatment to try to overcome the agoraphobia and other symptoms. With this combined treatment, she improved to the point that in October, 1998, Dr. Berv recommended that she could look for work. He now sees the plaintiff every 8 weeks for management of the above medication; he hopes to lengthen the time between visits to every 3 months, and, eventually to every 4 months.
During this whole time, the defendant continued to work full time. When he came home from work and on his days off he took over the care of John. As the plaintiff started to improve, she became unrestrained in her spending of money. She would spend money on the cable television channels that marketed shopping at home, and as she improved more, she would go to stores on their less busy hours and spend money there. Her expenditures became an issue of extraordinary tension between the parties. She shopped and spent money well past the family ability to pay the bills. They got into a lot of debt. Between the plaintiff's disability pay check and the defendant's regular paycheck there was not enough to pay all of the regular recurring bills and the debts that the plaintiff was incurring in CT Page 14730 her shopping sprees.
The plaintiff portrays her husband as a violent man who drank to excess and helped very little around the home after John was born. Her view is that she and her mother performed all of the domestic and most of the child rearing responsibilities. The court does not find the plaintiff's version of family life credible. The court does not find that the defendant drank alcohol irresponsibly in the home.
Further, the two alleged incidents of violence, are not as the plaintiff portrays them. Her entire demeanor when she described these incidents was edgy and evasive. Her testimony and the corroborating testimony of her mother had a rehearsed and hollow quality. The court finds that the plaintiff's assertion that she was in fear of the defendant to have no basis in the facts of the incidents she related. The plaintiff procured an ex parte restraining order (General Statutes §46b-15) order; however, at the hearing held fourteen days later, the court (Coppetto, J.) came to a similar conclusion as this court. This court finds that Mr. Fulton was far more credible in relating the two incidences in which Ms. Fulton claims he assaulted her. This events both occurred as a result of her loss of her temper and becoming hysterical.
The defendant paid off the debt the plaintiff was incurring from her spending sprees from both their joint tax refunds and his premarital savings. Their 1997 joint tax refund of $2,700.00 was used to pay credit card debt. Then he utilized $8,000.00 from the Merrill Lynch account of his Jiffy Lube franchise sale money to pay off the plaintiff's credit card purchases. He spoke with her about her spending and she agreed she would stop; she did not. In February, 1998 he withdrew another $12,700 from that account to pay off her credit card purchases. As the plaintiff spent more money, the tension it created led to arguments in the home. She was insistent that the defendant reduce his retirement contributions. He was resistant.
In May, 1998 when the plaintiff requested a new roof, the defendant agreed and paid for it from the Merrill Lynch funds. The plaintiff also wanted her credit card debts paid off again. The defendant suggested they pay it off monthly. The plaintiff then tried to write checks from the Merrill Lynch account herself to pay off the debt. The account was frozen so this could not occur. Suddenly she claimed the defendant was being physically violent with her and filed for divorce.
Prior to the parties' physical separation as of August, 1998, Mr. Fulton had paid off all of the credit cards; plaintiff had her own credit card debt in her own name as well. Any debt now on the plaintiff's financial affidavit she incurred since the parties have separated. Her CT Page 14731 mother has been giving her $200.00 per month toward household expenses. Mr. Fulton has been paying child support of $95.00. per week and a mortgage contribution of $93.00 per week, Her net weekly income including these contributions is for about $834.00 per week. Her expenses as shown on her financial affidavit, shows only a $30.00 per week shortfall. Yet, she had borrowed $17,000.00 from her mother which she has used toward attorney and expert fees for this litigation and, also, has incurred another $14,000.00 in credit card debt over the time from August, 1998 to the time of the hearing on this matter. The court finds that this extraordinary amount of debt is a violation of the automatic orders. The expenses of the plaintiff do not justify this level of debt.
Besides the $17,000 that Ms. Fulton borrowed from her mother for attorneys fees (although it is a loan, the mother had indicated that it is fine if the money is not paid back to her), she also liquidated an IRA for which she paid her attorney $3000 and by court order escrowed another $3000 to be used to pay the child's guardian ad litem. Since the automatic orders have been effect, the plaintiff has violated them by selling jewelry, her wedding band, gold jewelry and a diamond for $2300; she paid attorneys fees with that sum. In total, she has paid $11,000 to her prior divorce attorney, $11,000 to her present divorce attorney, $3,000 to the child's guardian ad litem and $1,000 for expert fees, for a total of $25,000.
The plaintiff does not believe that her husband was supportive of her through her illness. However, her expectations of him have been unreasonable since the onset of the marriage. During her illness, he worked a full time job, took care of John when he was home, did the family shopping, and took her to her doctor's appointments. When her illness took to spending he tried to work with her at stopping and paid the debt off more than once. He was not violent as she claims. He did not drink to excess. Ms. Fulton maintains that her husband promised her on marriage that he would get a great job, buy her a home, the best furniture, they would have two children and she could work part time. She has been disappointed in him over the failure to meet these things she says he promised. Surely, then he would not satisfy her in providing support during her illness. As Ms. Fulton told the psychologist who performed the family evaluation, "He promised me so much, but he was cheap and cold."
The court finds that neither party is more at fault for the breakdown of this marriage. Instead, it is a marriage where the parties' respective world views could not ultimately be reconciled and so it failed.
The current court order provides that John live with his mother; so long as the maternal grandmother lives with them. This has occurred; she CT Page 14732 has been living there since John was about four months old. However right through the spring of 1998, they would argue a lot; at one point she told her mother to move out and go live with a different family member. The plaintiff views that relation ship as much improved over the last two years. The plaintiff has testified that her mother will continue to live with her after the divorce is over.
The current access schedule was set by this court after hearing all of the evidence except the psychologist testimony. The current schedule provides that the child is with the father on Mondays and Tuesdays and with the Mother on Wednesdays and Thursdays and with each parent on alternating weekends. The previous pendente lite schedule had provided primary residence with the mother and the father had visitation generally on Wednesdays and Sundays and alternating Tuesdays overnight to Wednesday evenings. The Family Services officer recommends joint legal custody with primary residence to the mother and visitation to the father of alternating weekends from Friday to Sunday and each Tuesday evening to Wednesday evening, with shared holidays and each parent to have two weeks of uninterrupted vacation with the child. The guardian ad litem recommends a similar proposal but making the alternating weekends Friday to Monday and no overnight on the Wednesday until school starts for the child. Then, he would curtail the alternating weekend on Sunday. Mr. Fulton seeks sole custody with reasonable visitation to the wife. In the alternative, his written claims for relief seek, if he does not have the child live with him, he seeks Saturday overnight each week to Sunday and one evening per week; however, in testimony he was quite clear that he desired significantly more time with the child and his work schedule was fairly flexible. The mother seeks joint custody with physical custody with her. Her visitation schedule for the father was almost exactly the same as that of the guardian ad litem, although she suggests each have three weeks vacation with the child.
The family relations counselor states that both parents have the parenting skills required to care for John. Ironically, the family services officer found it striking how similar the parties' parenting styles were despite their asserted differences. The child's pediatrician told the family services officer that both the mother and father were involved parents, from his perspective. The parties have poor communication skills with each other. In the instance of this family, the poor communication is exacerbated when there is an impending court date. Ultimately, the family relations counselor both in her original report and its update, recommends that the parties share joint legal custody, that John reside primarily with is mother and have a specific schedule of visitation with his father.
It is the plaintiff's perspective that the parties work well together CT Page 14733 as joint custodians of the child when there is not a court proceeding hovering over their heads. She paints herself as a very open primary physical custodian, willing to discuss all of the issues of parenting with John's father and able to take the initiative to offer him more parenting time. She believes that their discipline styles of utilizing "time outs' is similar and their parenting goals the same. She perceives Mr. Fulton to be stricter than herself. Mr. Fulton perceives his wife has overly permissive and unable to consistently provide parenting guidance and discipline. He points to the inability of Ms. Fulton to take John to a store without buying him a toy. She acknowledged that she frequently purchases the child toys when out shopping. He believes that she does not know how to say `no' to John and that he has become manipulative and a behavior problem as a result. John's potty training has been slow. Mr. Fulton believes that it has been delayed as a result of the unwillingness of Ms. Fulton to encourage John in the enterprise, such that it is now a matter of some embarrassment for him. Ms. Fulton felt that John would come to this milestone achievement when he was ready and not before. The defendant is concerned that the plaintiff has a combative personality and yells and uses foul language often in the child's presence. The family services officer noted that both parents stated that the child has outbursts and uses foul language himself. The only positive thing that the plaintiff can say about the defendant as a parent is that he loves his son. Defendant when asked the same, can only say that the plaintiff loves her son, recognizes that he likes to play and she likes to participate in some of his activities. These parents fail to appreciate what each other have to offer the child as his parent.
Early in the process of this court action, the plaintiff was resistant to allowing him his visitation with John. In July, 1998, on a court-ordered visitation day she refused him visitation; only when a police officer then escorted him would she allow him to have the child for visitation. The transition around visitation remained problematic for most of the time of these proceedings. It has improved greatly as of about four months before the court hearing, in the spring of 2000. The plaintiff has become much more willing to make the transition of visitation easy and thus easier on the child. The father remains troubled that Ms. Fulton, in his mind, does not know how to set boundaries for the child.
The plaintiff's psychiatric illness does not pose a present problem in her caring for John. At its inception, she could not do so, and depended on both her husband and mother for John's care. As she improved, she had some difficulties which included mood swings, shouting and fits of violence and hysteria. However, these were all directed at the defendant and there is no way to discern whether they were triggered by problems in her marriage with him or a part of her condition. In any case, there is CT Page 14734 no evidence that the child has been subjected to any hysteria directed at him. It is clear, however, that her ability to function as she does now both working and caring for John when he is with her is dependent on her adherence to her prescriptive medicine requirements and continued care by Dr. Berv in the medicine management. She has demonstrated a willingness to do so.
The court ordered psychological evaluation was performed. It involved the evaluator meeting with each parent for clinical interview, the psychological testing of each parent, and then the clinical observance of each parent in a session interacting with the minor child, John. It was remarkable that these parents function at significantly different cognitive levels. Ms. Fulton functions in the higher end of the low average range. Overall, Mr. Fulton functions in the very superior range with general adaptive abilities. This is significant in the context of these parents because it provides him the tools to cope with the stress related problems these parents have in attempting to cooperatively parent this child. The evaluator, concluded overall after the evaluations that these parents, from a psychological health point of view are both "good enough' to be caretakers of the child. While Mr. Fulton is clearly the brighter individual, he also has a more rigid approach which may inhibit his son's development. Ms. Fulton's lesser cognitive ability causes her to sometimes miss the details of what is going on in interactions; this, too, may impose problems in recognizing John's psychological growth needs. In observing the child with each of his parents, he appeared to be a fairly normal four year old. He demonstrated more oppositional behavior with his mother, less willing to accept her direction and more willing to challenge her authority. Essentially, each parent had different strengths and weaknesses. As John progresses, Ms. Fulton's more stubborn style will provide challenges for the child. At the same time, Mr. Fulton "s more controlling personality will pose different problems for the child, as well. Both parents had difficulty engaging in fantasy play with the child, both removing themselves from that kind of interaction with him.
The court orders regarding custody require the court to determine what is in his best interest; they must take into account the historical patterns of caring for John, the security, stability and nurturance he needs as well as the strengths and weaknesses of each parent in providing for his needs.
The parties have various assets as shown on their financial affidavits, and as adduced from the evidence during the trial.
The court finds the present value of the marital home at 29 Crowley Avenue, Milford, Connecticut to be $165,000.00. The mortgage balance is $112,000. Mr. Fulton has a IRA with Merrill Lynch worth $18,000 and an CT Page 14735 interest in a Pennzoil 401k worth $17,500. He has an interest in the Pennzoil pension with no evidence provided to the court from which to determine its value. He has a $150,000 life insurance with approximately $6500 cash surrender value. Ms. Fulton has a pension with St. Raphaels' which will pay her $446.02 per month payable commencing December 1, 2024. She also has a retirement account with Fidelity valued at $16,000. Both parties have nominal amounts in personal savings and checking accounts. There is $73,800 in the jointly held Merrill Lynch Cash Management Account. Ms. Fulton has a 1993 Honda Civic with a value of $3,000. Mr. Fulton has a 1996 Jeep Cherokee valued at $12,000 with a loan of $10,500 and a 1966 Ford Mustang with a value of $5,000. Mr. Fulton holds assets in the child's name: a certificate of deposit of $1,000 and Fulton Bank stock worth $3,000. There is also a $40,000 life insurance policy that Mr. Fulton has through work and a $60,000 term policy that Ms. Fulton has through MetLife. The court finds that all of the life insurances currently in effect are reasonably affordable by each party.
The defendant is seeking certain personal property in the possession of the plaintiff at the formal marital home. He would like the following items that came from parents upon the death of his grandmother: freezer, dining room set including table, chairs, hutch and Friendly Village dining ware, and lawn equipment. The plaintiff does not want to allow him to have the dining room set because she is using it. The plaintiff is seeking the following personalty that he owned since before the marriage: a certain desk and 3/4 sized bed set and dresser (he states are family heirlooms) and its bedding, his dresser, a fold-out sleeper sofa, a 27 inch Sony TV and stand a stereo of an amplifier, tuner, cassette deck, CD player, turntable, speakers and cabinet, all the Lenox china (plain pattern), all the power hand tools, including car buffer, fishing gear and crabbing gear, his tools and hardware, and various other items on a list he submitted. The plaintiff wants to keep the bed set because the child uses it and the television because she uses it. She claims the stereo was bought while the parties were together and that she uses it. As to the many other items there were disputes between the parties that they each testified to.
The debt on Ms. Fulton's financial affidavit totals $41,682, not including her outstanding attorney fees or fees owed to the child's guardian ad lite. The debt has all been incurred by her. Her MBNA Visa had a balance of only $400.00 at the time of the parties' separation. Mr. Fulton's financial affidavit has debt of $37,500, which does not include any indebtedness for the child's guardian ad litem. $14,000 of it represents funds borrowed for attorney fees for this action. $712 represents moneys he claims were expended by his wife. The balance is money he borrowed to cover his short fall, and for the motel he stayed at for visitations when he first was ordered out of the home and stayed with CT Page 14736 his sister in Massachusetts. Under the current orders, Mr. Fulton pays $180 per week of a net of $505, after adding back in his 401k contributions. His rent at $150 per week cannot be termed excessive. His shortfall is $390.00 weekly. Mr. Fulton's earnings are $677 a week; Ms. Fulton's are $864 a week, all gross. Both parties are working full time at their traditional employment. Ms. Fulton is seeking alimony.
The gurdian ad litem has submitted an affidavit disclosing 57.25 hours at $200 per hour for total services of $11,450.00. The court notes that his apparent smallest billing increment is 15 minutes, regardless of the duty attended to. With consideration to the complexity of the matter and the rates prevalent in the area, and the expertise and experience of the guardian ad litem, who in this instance was a lawyer, but under the rules could have been a lay person, and the difficulties confronted, the court awards a guardian ad litem fee of $8,500.00. The court notes that he has been paid $1850 by each of the parties for total payment of $3700. Currently $1150 is in his trustee account from the parties' funds that sum is to be applied leaving a balance due of $3,650.00 to the guardian ad litem.
The court orders:
1. A dissolution of the marriage
2. Restoration of the plaintiff's maiden name to Isabelle Masteranti
3. Joint legal custody of the minor child, John. The minor child shall reside primarily with the mother, however subject to the liberal and reasonable access of the father with the minor child as follows:
Weekly Schedule:
 every other weekend Friday at 5 p.m. to Monday morning, at which time the child shall be transported to plaintiffs, the day care provider, or school, whichever shall apply;
every Wednesday from 9am to 7pm;
Holidays and vacations:
 The father shall have every Father's Day and three non-consecutive weeks every year with 60 days written notice.
 The mother shall have the child every Mother's Day and three nonconsecutive weeks every year with 60 days written notice. CT Page 14737
 The parties shall alternate holidays of New Years Day, Martin Luther King Day, Good Friday, Easter, Memorial Day, 4th of July, Labor Day, Columbus Day, and President's Day by alternating them yearly. The parties shall share Christmas yearly as follows: mother shall have the child with her until noon each day and the father shall have the child from 1 p.m. Christmas day until 9 am the following day. The child's birthday shall be shared so that the parent who does not normally have the child that day shall have no less than 3 continuous hours with the child that day.
 Holiday and vacation schedule takes priority over the weekly schedule. If the parties have family traditions or work schedules that would make sense for them to agree jointly to vary the holiday schedule, they may do so provided it is in writing signed by each of them and specific as to whether it is a one-time alteration or shall occur on a repeated basis.
4. The father shall pay the mother the presumptive child support guidelines amount of $98.00 per week by immediate wage withholding order. The father shall pay 37% of the work related day care qualifying costs as defined in the child support guidelines as incurred by the plaintiff within 7 days written notice of the amount due. Child support obligations are to be paid regardless of who the child is with for a specific week under the schedule above.
5. The father shall pay 37% of health expenditures not paid for by health insurance not paid for by health insurance for the minor child after the first $100 per year; the mother shall pay 63% of health expenditures for the minor child plus the first $100 per year, pursuant to the child support guidelines.
6. The father shall be the primary provider of health insurance for the minor child. If he is unable to attain the same through his employment or if comparable or better coverage is available through the mother through her employment then she shall become the primary carrier. The parties shall each provide each other with written notice of their respective coverage ability for the child and the premium cost for the same so that an appropriate election under this order can be made.
7. Each party shall maintain the life insurance that they currently have in effect for the benefit of the minor child so long as the child is a minor and not emancipated.
8. No alimony is ordered to either party. CT Page 14738
9. The wife is the sole owner of her 1993 Honda Civic and the husband is the sole owner of the 1966 Ford Mustang and the 1996 Jeep Cherokee.
10. The wife is the sole owner of her St. Raphael's pension and her Fidelity Investment retirement account valued at approximately $16,047.
11. The husband is the sole owner of his Pennzoil pension and his Merrill Lynch Ira of $18,000 and his Pennzoil 401k account of about $17,500.
12. The husband is the sole owner of the Merrill Lynch Cash Management account of approximately $73,683.
13. The husband shall within 30 days quit claim all of his right, title and interest in and to the marital home at 29 Crowley Avenue, Milford, CT to the wife. She shall indemnify him and hold him harmless on all expenses pertaining thereto, including the mortgage debt thereon.
 Within 4 years the plaintiff shall pay the defendant $15,000 and she shall cause the defendant's name to be removed from the note secured by a mortgage on the premises, by refinance or sale of the premises. If she fails to accomplish both orders, the defendant may, inter alia, at his option come to this court for an order requiring the sale of the premises. The $15,000 shall be secured by a promissory note and mortgage in a form substantially similar to a FNMA form. The $15,000 shall be sooner due on the plaintiff's remarriage, cohabitation with an unrelated male, her death, sale of the premises or failure to maintain the premises as her principal residence. if payment is not made timely, it shall bear interest at the rate of 10% dating back to the date of the filing of this order.
14. Each party shall be the sole owner of their respective bank accounts not referred to above.
15. Each party is solely responsible for the debt on their respective financial affidavits with the exception of the funds due to the guardian ad litem.
16. Within 30 days, each party shall execute all documents necessary to transfer ownership of assets consistent with these orders.
17. The guardian ad litem's bill of $3650 is ordered paid one half by each party. It shall be paid by each at a rate not less than $50.00 per month until the parties' obligation is fully discharged. CT Page 14739
18. The defendant is the sole owner of the following items which he shall retrieve from the marital home, with the cooperation of the plaintiff which shall be provided by her within within 90 days, at a time to be arranged by the parties when the minor child is not present: from his parents-the freezer, dining room set, tables, chairs, hutch and Friendly Village dining ware, the desk, fold-out sleeper sofa, 27 inch Sony TV and stand, the stereo of amplifier, tuner, cassette deck, CD player, turntable, speakers and cabinet, all the Lenox china with plain pattern, all the power hand tools including the car buffer, his fishing and crabbing gear, tools and hardware he owned before the marriage, not purchased by plaintiff, lawn equipment from his family, Christmas decorations from his family only, his athletic equipment, his passport and other personal papers, sleigh bells, rowboat and its equipment, and as long as he delivers a bed and dresser at time of transfer for his son to use, the 3/4 sized bed and dresser that he inherited from his family.
19. Each party shall be the sole owner of such other possessions currently in their respective physical custody.
20. The husband shall continue to maintain the assets held for the benefit of his son until his son's minority ends.
21. The parties shall alternate the tax exemption for John, with Mr. Fulton claiming him in even number years, so long as he is current in his child support for the year he is claiming him. The parties shall execute the necessary documents to effectuate this provision.
22. No counsel fees are ordered to be paid to the other, by either party.
It is so ordered.
MUNRO, J.